## J. B. CLAY et al., Appellees, v. INDEPENDENT SCHOOL DISTRICT OF CEDAR FALLS et al., Appellants.

SCHOOLS AND SCHOOL DISTRICTS: Government, Officers, Meetings, Etc.—Teachers' Certificates. The granting of teachers' certificates, regular or provisional, is committed to the discretion of the officers named for that purpose, and the exercise of that discretion will not be controlled or overruled by mandamus or injunction.

SCHOOLS AND SCHOOL DISTRICTS: Government, Officers, Meetings, Etc.—Teachers' Certificates. The genuineness of a teacher's certificate being admitted, it will be presumed to have been duly issued, and the officer issuing it will be presumed to have performed his duty, and satisfied himself as to the proper qualifications of the recipient; and a teacher's provisional certificate, issued by the superintendent of public schools, under Sec. 2734-p2, Code Supp., 1913, will be presumed to be valid.

SCHOOLS AND SCHOOL DISTRICTS: Government, Officers, Meetings, Etc.—Acts of School Directors. Under Sec. 2818, Code, 1897, acts of school directors concerning matters within their discretion, under Code Sec. 2678 and Secs. 2772, 2773, and 2778, Code Supp., 1913, can only be reviewed by appeal to the county superintendent, and thence to the state superintendnt; and an injunction will not lie, except where the acts sought to be enjoined are wholly outside the limits of the school board's authority.

SCHOOLS AND SCHOOL DISTRICTS: Government, Officers, Meetings, Etc.—Employment of Uncertified Teachers. The employment of a teacher without a certificate is an unauthorized act, under the law, and injunction will lie to restrain such employment.

SCHOOLS AND SCHOOL DISTRICTS: Government, Officers, Meetings, Etc.—Employment of Normal School Students as Teachers. Under Sec. 2678, Code, 1897, the directors of a school district in which or adjacent to which a state normal school is conducted, may contract with such normal school to receive and instruct the pupils of such district school. Students of such normal school may practice teaching in the public schools of such school district, without compensation, and under the super-

vision of a public school teacher, and are not required to have a teacher's certificate.

LADD, C. J., GAYNOR and STEVENS, JJ., dissent.

SCHOOLS AND SCHOOL DISTRICTS: Government, Officers, Meetings, Etc.—Number of Teachers. The courts will not examine into and determine the number of teachers a given school shall employ, such question being within the discretion of the school directors.

SCHOOLS AND SCHOOL DISTRICTS: Government, Officers, Meetings, Etc.—Teachers. A school teacher may lawfully divide her time and labor and services between two schools, and receive compensation from both of them, where both employers consent, and her payments are equitably proportioned between the schools.

SCHOOLS AND SCHOOL DISTRICTS: Government, Officers, Meetings, Etc.—Allowing School of Pedagogy in School Building. School directors who permitted students of a normal school to practice teaching in public schools without compensation, under supervision of a public school teacher, did not abuse their authority by permitting the conducting of a school of pedagogy in the school building.

SCHOOLS AND SCHOOL DISTRICTS: Government, Officers, Meetings, Etc.—Employment of Students as Teachers. In an action for mandamus, to require school directors to discontinue permitting normal school students to teach in the public schools, and to enjoin the payment of school funds to a teacher supervising such teaching, on the ground that it is an unauthorized use of the school building and funds, the burden is on the complainants to prove themselves entitled to the relief prayed for.

SCHOOLS AND SCHOOL DISTRICTS: Government, Officers, Meetings, Etc.—Employment of Students as Teachers. A court of equity will not require school directors to discontinue the permitting of normal school students with provisional certificates to practice teaching in the public schools, nor enjoin the school directors from paying school funds to teachers spending part of their time in supervising such teaching, as such acts are not in excess of the directors' authority, and the proper remedy is by appeal to the county superintendent.

LADD, C. J., GAYNOR and STEVENS, JJ., dissent.

*Appeal from Black Hawk District Court.*—H. B. BOIES, Judge.

SEPTEMBER 26, 1919.

ACTION in equity for an injunction and for a writ of mandamus to be directed to the board of directors of the defendant school district. There was a decree as prayed, and defendants appeal. The material facts are sufficiently stated in the opinion.—*Reversed.*

*W. H. Merner* and *Mears & Lovejoy,* for appellants.

*George D. Harris* and *Pickett, Swisher & Farwell,* for appellees.

WEAVER, J.—There is in this case but little dispute upon the essential facts, and the general situation may be stated as follows: The independent school district of Cedar Falls maintains five or more separate schools, housed in separate buildings, owned and used by the district for that purpose. In the same territory, or adjacent thereto, is located the Iowa State Teachers' College, formerly better known as the Iowa State Normal School. In one of its buildings, the college maintains a normal training school, and, by an arrangement between the college and the district, authorized by statute for that purpose, all pupils of school age residing in a certain section of the district are required to attend the school conducted in said normal training building, where they are instructed by teachers employed by the college. The remainder of the school population of the district attends the public schools in the buildings first above mentioned. As is well known, the chief purpose for which the State Teachers' College was founded and is maintained is the education and training of its students for service as teachers in the public schools and other institutions of learning in which they may find employment. Neither party to this litigation questions the propriety or regularity of the matters thus far related, but they afford material aid in making clear what follows.

The board of directors of the district and the college authorities entered into an agreement whereby certain of the more advanced students of the college, usually members of its graduating class, came into certain of the public schools, and undertook to teach or instruct a certain designated grade or class of pupils during a part of the day, such teaching being done and instruction given under the supervision, advice, and criticism of the public school teacher in regular charge of the room. This teacher, while so engaged in supervising and directing the student teachers in said service, was known and is spoken of in the record as a "critic teacher." Prior to the beginning of this action, the student teachers were not required to have certificates from the state superintendent of public instruction, and they served without salary or wages from the district, and without written contract with the district; but, by reason of such service, they received certain credits in their examination for graduation from the college. It also appears that, in the employment of teachers to have charge of the public schools where the foregoing plan of work was followed, the board of directors agreed to take into consideration the recommendations of applicants by the college and by the city superintendent of schools; but there is no evidence that the board surrendered or delegated its right or authority to act in such matters upon its own uncontrolled judgment, as should seem to it best for the benefit of the schools. It is further conceded that the teachers having special charge of these rooms were employed and paid by the district less than full-time wages, and were paid by the college for so much of their time as was given to their work as critic teachers.

At the outset of this action, the plaintiffs, who are residents and taxpayers of the district, challenged the regularity and legality of said arrangement, and by their original petition prayed that a writ of mandamus issue, commanding the defendants to discontinue employment of, or

permission to, any person to teach in any of the schools of the district, except persons legally qualified or authorized to serve in that capacity, and further asked a writ of injunction, to forbid the payment or expenditure of moneys or funds. of the district to any teacher employed as a critic teacher, or who was, in fact, devoting his or her service, in whole or in part, to teaching or supervising students of the college. After the petition had been filed, and doubtless for the purpose of removing, if possible, any objection to the student teachers because they did not hold certificates, application was made to the state superintendent to issue to them provisional certificates, as authorized by Section 2734-p2, Code Supplement, 1913. The application was granted, the certificates were issued by the state superintendent, and forwarded in the usual course to the county superintendent, to be by him recorded and delivered to the persons therein named. This fact coming to the knowledge of the plaintiffs, they amended their petition, stating the fact of the issuance of the certificates, alleging that they had been issued improvidently and without proper showing therefor, and that there was no occasion or necessity for the employment of additional teachers in the schools of the district. Upon these allegations, an injunction was asked and granted against the county superintendent, who was made a defendant in the case, forbidding the delivery of the certificates to the persons for whom they were intended. Neither the state superintendent, who issued the certificates, nor the student teachers in whose favor they had been issued, were made parties to the proceeding, and the record does not reveal upon what showing or evidence the state superintendent acted in granting the certificates, except an indorsement upon each certificate, showing the credits accepted in lieu of an examination upon educational qualifications of the applicant.

In answer, the defendants denied the employment of

any teacher or teachers in violation of law, or the expenditure of the funds of the district for the service of uncertified teachers, and denied having permitted the use of the school buildings or property for any use inconsistent with the purposes for which such buildings and property have been provided.

There is much said in the petition concerning the details of the management of these schools, the method and manner of the instruction given the class or grade served by the student teachers, and the alleged ill effects of the arrangement complained of; but, there being little, if any, evidence in support of these allegations, and no insistence upon them in argument, we do not take time to recite them here.

The evidence in the case is, for the most part, given by teachers connected with the schools and college, who were minutely examined and cross-examined concerning the so-called co-operative plan existing between the schools and the college; but the ultimate effect of the facts developed is fairly reflected in what we have already stated. It is made to appear that the use of student teachers in some form had been continued through several school years; and, while the plan of the arrangement had, on one or two occasions, been reduced to writing, in the form of a proposal by the college, and submitted to the board; no formal contract appears to have been executed. It was first inaugurated in the kindergarten, at the request of the board of directors of the school district, in the belief that this department would thereby receive superior advantages, and was later, from time to time, extended to include some one grade in other schools, the plan of conducting it being arranged and developed by consultation between the president of the board, the city superintendent of schools, and some representative of the college. Such plan at all times included a condition by which the salaries of teachers di-

viding their time between the service of the district and the service of the college should be apportioned and paid by the district and college in like ratio. It should, perhaps, also be said that the college employed a superior, or head, critic teacher, who exercised supervision over the work of student teaching generally, and as such, she visited the schools, observing the work done, and offering advice and suggestion as she might think was needed; and for this service she was paid by the college alone.

Upon hearing the evidence, the trial court entered a decree that the plan by which student teachers are allowed to teach or assist in teaching in the public schools, under the supervision of critic teachers employed by and paid in whole or in part by the college, is illegal; that the students theretofore employed in that capacity were not provided with certificates, nor under contract with the district, as provided by law; and that this objection was not removed by the issuance of the provisional certificates, nor by the further fact shown that the board of directors had entered into written contract with the persons to whom such provisional certificates had been issued. The court further found that the plan by which the student teachers were permitted to teach or assist in teaching in the public schools, and thereby earn credits for their graduation from the college, and the supervision of such teaching by college teachers, or by public school teachers, paid in part by the college, is, in effect, the establishment and carrying on of a school of pedagogy for the benefit of the college, and is, therefore, an unlawful misuse of the public school buildings and property. Upon these findings, the court ordered that a writ of mandamus and an injunction issue, substantially as prayed in plaintiffs' petition, and that the temporary injunction restraining the county superintendent from delivering the provisional certificates to the student teachers be made permanent.

I. In view of the somewhat important part which the injunction forbidding the delivery of the provisional certificates plays in the consideration of other features of the case, we give it first attention.

1. SCHOOLS AND SCHOOL DISTRICTS: government, officers, meetings, etc.: teachers' certificates.

Under the law of this state as it now exists, the granting of licenses or certificates of authority to teach in the public schools rests in the state superintendent of public instruction, or rather, in the educational board of examiners, of which he is ex-officio president. Ordinarily, examinations are had and reduced to writing before the county superintendent, who forwards them to his superior officer, and, if these be found satisfactory, certificates are issued and returned to the county superintendent, who records and delivers them to the persons to whom they are granted. Further provision is made for the issuance of provisional certificates to applicants, when the demand for teachers exceeds the supply of those holding regular certificates. The language of the statute is that:

"If there should be schools without teachers and teachers cannot be secured with qualifications as provided * * * provisional certificates may be issued, regardless of [statutory] qualifications * * * to so many teachers as may be required to supply such schools."

In practice, as we understand it, the county superintendent, if applied to for that purpose, forwards the application to the board of educational examiners, of which the state superintendent is, *ex officio*, the head, and if, under the circumstances shown, the board approves the application, a provisional certificate is granted, and the document so issued is returned to the county superintendent for record and delivery in the usual manner. The application of the student teachers in this instance passed through the usual routine; was approved by the state superintendent; returned to the county superintendent; at least one had, in

fact, been delivered, and others were held for delivery, which was interrupted by the injunction. Concerning what showing was made to the state superintendent of the existence of an emergency calling for the issuance of the certificates, or what investigation or inquiry he may have made upon that subject, there is nothing whatever in the record.

The granting of a certificate, regular or provisional, is committed to the discretion of the officer named for that purpose, and the exercise of that discretion will not be controlled or overruled by mandamus or injunction. *Bailey v. Ewart,* 52 Iowa 111. The genuineness

2. SCHOOLS AND SCHOOL DIS-TRICTS: government, officers, meetings, etc.: teachers' certificates.

of a certificate being admitted, it will be presumed to have been duly issued, and the officer issuing it will be presumed to have performed his duty, and satisfied himself of the proper qualifications of the recipient, and of the existence of the facts justifying his action in the matter.

This is surely true where there is, as in the case at bar, an utter absence of evidence as to the showing made to the certifying officer in support of the application for the certificate; and neither the trial court nor this court is at liberty to proceed on the theory that the provisional certificates in this case are void. It follows, of necessity, that, in so far as the decree appealed from is made to rest on the theory that said certificates are without validity, it cannot be sustained.

II. We have, then, to consider whether, independent of the issue sought to be made upon the validity of the certificates, plaintiffs have made a case calling for the relief granted by the trial court. Reduced to brief terms, the substance of plaintiffs' complaint is: (1) That the board of directors was employing uncertified and unqualified teachers for the public schools under their

3. SCHOOLS AND SCHOOL DIS-TRICTS: government, officers, meetings, etc.: acts of school directors.

official charge; and (2) that it was subjecting the school buildings and property to occupancy and use wholly foreign to the purposes and uses for which they are provided, and to which they are dedicated.

Due consideration of these objections requires some inquiry into the discretion with which a board of school directors is clothed, and how far, if at all, a court of equity will interfere with its exercise. It is said by Mr. High, a leading authority upon the subject:

"No principle of equity jurisprudence is better established than that courts of equity will not sit in review of the proceedings of subordinate political or municipal tribunals, and that, where matters are left to the discretion of such bodies, the exercise of that discretion in good faith is conclusive, and will not, in the absence of fraud, be disturbed." High on Injunctions (4th Ed.) Sections 1240, 1311.

This principle has been recognized and applied by this court in many cases, of which we may cite: *Brewster v. City of Davenport*, 51 Iowa 427; *Kirchner v. Board of Directors*, 141 Iowa 43, 51; *Spitzer v. Runyan*, 113 Iowa 619; *Sperry v. Kretchner*, 65 Iowa 525; *Scripture v. Burns*, 59 Iowa 70; *Kinzer v. Directors of Ind. S. Dist.*, 129 Iowa 441; *Shoemaker v. City of Des Moines*, 129 Iowa 244; *Moses v. Risdon*, 46 Iowa 251; *James v. Gettinger*, 123 Iowa 199; *Crawford v. School Township*, 182 Iowa 1324; *Bailey v. Ewart*, 52 Iowa 111.

The school system of Iowa has been framed with special care to keep its management and control separate and distinct from other local jurisdictions having more directly to do with the administration of public affairs in general. Neither the county, city, town, or township, as such, is given power or authority over the schools, but the administration of the affairs of the system rests in the people themselves, in their capacity as electors, in local of-

ficers and boards, and in county and state superintendents. The officers and boards have not only a wide range of discretion in matters of administration, but are vested with much authority which is judicial, or quasi judicial, in character, with the result that, of the very large number of questions arising for solution in carrying on the vast and more or less complicated affairs of this system, which reaches into every neighborhood throughout the state, comparatively few find their way into the courts for adjudication. This is as it should be, and the court should hesitate long before using its extraordinary powers of injunction or mandamus to control the administration of school affairs, where there is no clear showing of fraud or other flagrant wrong.

Now, what authority and discretion does our school statute confer upon the governing board of a district? Among the many things expressly authorized, the directors may determine the number of schools to be taught and the number of teachers to be employed; may divide the territory of their district into wards for school purposes; may designate the school which each child shall attend; may provide in each district one or more schools of a higher order; may establish graded or union schools, and may provide in each district one or more schools of a higher order; may establish graded or union schools; and may elect all teachers and make all contracts necessary or proper for exercising the powers and performing the duties required of them by law. They may prescribe courses of study for the schools under their jurisdiction, and make rules and regulations for the government of directors, officers, teachers, and pupils. Code Sections 2772, 2773, 2776, 2778. The directors of a district in which or adjacent to which a state normal school is conducted, may contract with such normal school to receive and instruct the pupils of such districts for periods of two years at a time. Code Sec-

tion 2678. These are but a few of the multifarious duties required and power conferred upon the district and its board of directors, and for any and all acts fairly within their scope the directors are answerable to no other tribunal than the people who elected them to that trust, and can replace them by others if they so express their will at the polls.

Reference is here made to Code Section 2678, not because it has any immediate application to the matters now in controversy, but simply to indicate the absence of any legislative policy or established public policy which condemns reasonable co-operation between the public schools and the Teachers' College.

The method provided by our statute for a review of the acts of the directors concerning which they have any discretion is by appeal to the county superintendent, and thence to the state superintendent (Code Section 2818), and injunction will lie only where the act sought to be enjoined is wholly outside of the limits of the board's authority. *Templer v. School Twp.*, 160 Iowa 398, 401; *Aananson v. Anderson*, 70 Iowa 102; *Kinzer v. Independent School Dist.*, 129 Iowa 441, 443.

Bearing these rules in mind, and remembering that the statute requires the board to select only such teachers as have been properly certified by the state superintendent, it may be conceded that the employment of uncertified teachers would be an unauthorized act, and that, if the board in this case were, in fact, violating the law in this respect, injunction would lie to correct such practice. What the evidence shows in this respect has already been stated, in substance. That the student teachers, so-called, did not hold certificates prior to the issuance of the provisional certificates is admitted, and if the service they performed was such as to bring

4. SCHOOLS AND SCHOOL DISTRICTS: government, officers, meetings, etc.: employment of uncertified teachers.

them within the scope of the statute, then the board exceeded its authority in permitting it. It is very doubtful, however, whether the statute prohibiting the employment of uncertified teachers has any application to a case where the person in question does no more than to render gratuitous temporary or incidental assistance to a competent and duly certified teacher, who has the room and pupils in her immediate charge and control. It is certainly neither unknown nor a reprehensible practice for a responsible teacher in charge of a school or department to call upon bright and promising students or pupils to assist her in some phase of the work of instruction, nor is she open to just condemnation if, in so doing, she is actuated more by a desire to encourage and develop the capacity of such young persons than by any pressing need of assistance in her work. Again, as we have seen, we have a

5. SCHOOLS AND SCHOOL DISTRICTS: government, officers, meetings, etc.; employment of normal school students as teachers.

statute which permits the district to arrange with the college for the attendance of at least a part of the pupils of the district at the normal training school. It is very evident that this arrangement contemplates an advantage to the district in the instruction of such pupils, as well as an advantage to the Teachers' College in affording its students the benefit of an object lesson in teaching, and at the same time an opportunity for what the appellee calls "practice teaching," under the direction and leadership of the responsible members of the teaching force having such school in charge. No one, we think, would contend that the college student availing himself or herself of the advantage of such training or such practice teaching is required to hold a certificate; and if none be required in such case, what better reason is there for demanding it of other students performing the same service in other schools of the same district?

But this question has become one of merely academic

interest, so far as the present case is concerned, by the act of the student teachers in securing certificates, and of the board of directors in entering into written contracts with them for a continuation of their service as assistants in the several schools to which they are assigned, thus complying with appellee's interpretation of the statute, if it be applicable under the admitted circumstances, and obviating any necessity for an injunction.

That, subject to any existing statutory regulations, the determination of the number of public schools within the district, the number of teachers, the terms of their employment, the nature and extent of the service to be employed by them, the organization of the schools, the designation of the buildings or departments where pupils shall attend, the adoption of rules, and other matters pertaining legitimately to the details of administration of district affairs, are all within the discretion of the directors, is not denied. If, however, such discretion is so used as to aggrieve any person, citizen, taxpayer, or patron, the act complained of may be reviewed on appeal to the superintendent; but, so long as they confine their official acts within these limits, even though their conduct be unwise or opposed to the sentiment of the people generally, the courts will not attempt to control or annul their action. For example, it is alleged and argued that the public schools of Cedar Falls, Iowa, have an adequate teaching force, and that the assistance of the student teachers is not needed, and that, for this reason, their employment and use should be enjoined. In our judgment, this is a question so clearly within the discretion of the directors as to leave no room for argument. Surely, the court cannot be expected to examine into and determine the number of teachers a given school or district shall employ. If a citizen may bring the directors into

6. SCHOOLS AND SCHOOL DISTRICTS: government. officers, meetings, etc.: employment of students as teachers.

court, and compel the discharge of a part of the teaching force because more are employed than are needed, why may not another citizen maintain another action at the next term to compel an enlargement of the force, because of an alleged increase of the school population? And why may not every exercise of the board's discretion to which any citizen objects be made the subject of judicial inquiry and controlled by mandamus and injunction?

We do not hold, and it is not within our province to say, that, in adopting this plan of co-operation with the college, the board did that which was wisest or best; though, if that were a decisive consideration, it would not be difficult to advance many plausible arguments in its favor. The question before us is not one of policy or comparative excellence or efficiency, but one of power and authority. If this has not been exceeded by the district or its directors, the plaintiffs' action cannot be maintained.

Again, it is said in the petition, and is urged in argument by the appellee, and reiterated by the trial court in its findings, as if it were a matter of decisive weight, that college students who assist the teachers of the public schools do so for the credits which will be allowed them for such work in their final examination for graduation from the college. If it be admitted that, were it not for the credits to be thus earned, the students would not take up this work, it is very difficult to see how that fact affects the merits of the case. It is a matter of common observation that, of the great number of teachers in the public schools throughout the country, a very large proportion is pursuing that occupation as a stepping stone to the college or the university, or to entrance upon some other profession or business. The higher institutions very generally observe a system of credits for any work, acquirement, or accomplishment which serves to prepare an entrant for the course he intends to pursue, or which adds to the fitness or

preparation of a candidate for graduation. If these candidates for graduation from the State Teachers' College were stimulated to the performance of this service to the school district by the hope or promise of credits thus to be obtained, it detracts nothing from their merits. What the district contracts for and expects to get from the students is certain specified service in its school rooms. If that service is honestly and fairly rendered, the district receives all it is entitled to demand. The incidental benefits which the student gets in the form of credits in her college examinations is a thing to which neither the district nor its citizens nor its taxpayers can properly take exception.

III. Another objection raised in connection with this feature of the case is that certain of the teachers, including the city superintendent and the teachers in charge of rooms where student teachers are employed, receive certain payments from the college. We are unable to see why a teacher may not lawfully divide her time and labor between two schools, and receive compensation from both, where both employers consent, and payment is equitably proportioned to each. If these schools were rivals, and service rendered to one involved any disloyalty to the other, there might be room for objection; but there is no showing that the district has paid these teachers, or any of them, any more than their stipulated wages for the time actually employed, or that the teachers have failed to return the full equivalent therefor in honest service.

7. SCHOOLS AND SCHOOL DIS- TRICTS: government, officers, meetings, etc.: teachers.

IV. But, say the appellees, the system by which students are permitted to assist in the instruction of certain classes in the district school under the supervision of critic

**8. SCHOOLS AND SCHOOL DISTRICTS: government, officers, meetings, etc.: allowing school of pedagogy in school building.** teachers is, to all intents and purposes, the establishment of a school of pedagogy in the public school buildings, and this is an abuse or misuse of the property to which the directors cannot lawfully consent, and therefore should be enjoined.

The objection has no substantial foundation in the record. Indeed, it does not appear to have occurred to the plaintiffs or their counsel until long after the suit was begun. So far as the record shows, every school room of the district has been open for its appropriate use as a public school on every school day in the year, and has at all times been attended by its proper quota of pupils there receiving instruction. Neither is there any showing that the studies of the pupils or their proper supervision and instruction have been obstructed, interrupted, or suspended in any manner or degree by the alleged misuse of the school property. The sum and substance of the objection, concretely stated, is simply this: that, whereas the office of a school of pedagogy is to impart instruction in the theory and practice of teaching, and whereas, under the so-called co-operative plan between the school district and the college, student teachers or assistants, in performing service for the district, have the advantage of supervision and advice by the critic teachers, thereby presumably acquiring increased proficiency and skill as teachers, it follows that the school where this is done or permitted is, in fact, a school of pedagogy, and cannot lawfully be conducted in a public school building. The mere statement of the proposition demonstrates its unsoundness. If entitled to recognition as an argument, it proves too much. It can hardly be denied that, if the directors of a district having a multiplicity of schools, and employing numerous teachers, deem it wise, it is within their discretion to employ a so-called "critic teacher," whose special duty it is to supervise and direct

the work of the several members of the teaching force with reference to their capacity to teach, their manner and method of imparting instruction, and their general efficiency, and to give to each such expert advice and guidance as occasion may require. Indeed, this, to a great extent, is the office and duty of the superintendent or official head of the body of teachers in such a district, and the value of his service in that capacity is to be measured very largely by his ability to develop the best that is in the members of his faculty, and make them increasingly efficient as instructors of the pupils committed to their charge. This, none will deny; but who will gravely assert that the performance of this duty by the superintendent or by a critic teacher employed for that special purpose is, in law or in fact, the establishment or maintenance of a "school of pedagogy?" True, the teacher or student having these advantages may acquire valuable training, of a character similar to that afforded by a school of pedagogy; but similarity of product does not necessarily argue identity in the source of production. Further comment on this issue is unnecessary. The charge that the defendants have abused their authority by permitting the establishment or conduct of a school of pedagogy in the public school buildings has not been proven.

So far as we may discover from the entire record, there has been no fraud or corruption on the part of the board of directors or any member thereof, nor, indeed, is there any charge of such wrong. The funds of the district have not been misappropriated or diverted from their proper uses. Neither the school district in general nor the plaintiffs in particular have been deprived of anything to which they are entitled. No irreparable injury to the plaintiffs has been shown, nor does any appear to be threatened. The burden of proof is on the

9. SCHOOLS AND SCHOOL DISTRICTS: government, officers, meetings. etc.: employment of students as teachers.

plaintiffs, and there is a manifest failure to satisfy this requirement of the law.   In short, we hold that on none of the grounds stated in the petition have plaintiffs made a case upon which the court is authorized to grant the relief prayed, and the petition should, therefore, be dismissed.

10. SCHOOLS AND SCHOOL DISTRICTS: government, officers, meetings, etc.: employment of students as teachers.

In so ordering, it should be said that the one decision upon which the plaintiffs rely (*Lindblad v. Board of Ed.*, 221 Ill. 261 [77 N. E. 450]) differs so widely in its controlling facts from those developed in this case as to be without value as a precedent for our guidance.   It is evident that the petition in the present case was drawn or framed to bring it, so far as possible, into line with the *Lindblad* case; but, in so far as the allegations might have that effect, they are without support in the record.

The controversy which has developed into this litigation is an unfortunate one.   In its final analysis, however, it is one of policy or administration, rather than one of power or authority.   It involves questions the solution of which is for the people of the district, rather than for the courts.   The school district is about the only survival in Iowa which approaches in some degree that pure democracy in local government of which the "town meeting" in the older states was a type.   In the long run, all disputes over questions of policy with reference to schools in any given district are solved at the polls.   Alleged grievances growing out of the ordinary administration of the district's business, or out of the exercise of the functions of the board of directors, have a speedy and adequate remedy by appeal to the county superintendent; and, while courts of equity will not hesitate to interfere, and rebuke or prohibit any act done in manifest excess of authority by a district or by its officers, it will not take jurisdiction of any controversy for which a direct and appropriate legal remedy is provided.

It follows that the decree entered by the district court must be reversed, and that the injunction therein provided for will be dissolved.—*Reversed.*

EVANS, PRESTON, and SALINGER, JJ., concur.

SALINGER, J.—My concurrence is special. The reasons for it are, in the main, set forth in my dissent in *Knowlton v. Baumhover*, 182 Iowa 691.

STEVENS, J. (dissenting). I. The opinion of the majority proceeds upon the theory that the questions presented upon this appeal involve only (a) the discretion of the superintendent of public instruction in issuing provisional certificates to the student teachers, and (b) the discretion of the defendant school board in the determination of the number and the selection of the teachers to be employed to teach in the public schools of Cedar Falls.

That public school officers exercise a large discretion in the performance of their duties is, of course, conceded. Their discretion however, is limited by the statute, and arises out of the express or implied powers conferred thereby. In the view of the writer, no question involving the discretion of either the state superintendent or the school board is involved in the questions presented by this appeal. The decision must turn upon the legality of the action of the defendant board, and not upon a matter of discretion. Whether the superintendent of public instruction acted within his discretion or illegally is not, as I view it, of paramount or controlling importance in this case.

A somewhat more complete statement of the record than appears in the majority opinion is necessary to a clear discussion and understanding of the questions involved. The "critic teacher," or supervisor of the student teachers, is employed by, serves, and is paid by the State Teachers' College. The three assistant critic teachers, employed jointly by the board and the Teachers' College, render separate and independent services in their capacity as teachers and

as "critic teachers." In their capacity as "critic teachers,". they serve only the Teachers' College. The number of student teachers doing practice teaching varies somewhat. During the fall term of 1917, there were 39, and, at the time of the trial of this case, 35 students employed. During the school year of 1917-18, 103 students, in all, were thus engaged. The duty of the "critic teacher" is to supervise, confer with, and aid the assistant critic teachers in their work for and on behalf of the college, as instructors of the student teachers. The student teachers have temporary charge of and teach certain of the pupils of the public schools.

Prior to the commencement of this suit, if student teachers were employed at all by the school board, it was by some sort of verbal understanding, and none of them were provided with teachers' certificates. They are referred to as student teachers, because they are thus identified both as students of the State Teachers' College and teachers in the public schools. As students of the college, they pursue a course in pedagogy, and are given credit by the college for the work done in the public schools. In addition to the student teachers who perform services in the public schools, a full force of teachers is employed.

The superintendent of the public schools testified that the number of teachers regularly employed in the schools of Cedar Falls was, for the year 1916-17, 37, and for the year 1917-18, 42; and that he considered same a full corps of teachers for the schools of said city, which has a population of about 6,000. After this suit was instituted, a plan was devised by which provisional certificates were issued by the superintendent of public instruction to each of the student teachers at that time pursuing a course of pedagogy in the Teachers' College and performing services as student teachers in the public schools. The defendant county superintendent testified, concerning the procurement of said certificates, that:

"On December 8, 1917, there were vacancies in the schools of Black Hawk County. There was one in Cedar Township, and there is a vacancy there still. There is one in Lester Township they have been unable to fill, and I was informed it would be necessary to fill certain positions in the Cedar Falls schools, and that these people would be required to hold certificates, and we had no teachers for them. President Seerley informed me of that fact. With reference to the work that has been done by student teachers in the Cedar Falls schools, I was informed that, in all probability, it would be required that these teachers should hold certificates. Mr. Seerley gave me information as to vacancies with reference to the positions in the Cedar Falls schools. He did not use the word 'vacancies.' These positions had been filled during the fall terms by student teachers, and were now to be filled by other students, and it was necessary for them to hold certificates. I know in a general way what those positions were. * * * The request for these certificates was made by Dr. Hearst. President Seerley, in his interview with me, merely explained that the certificates would be needed. After that, Dr. Hearst made a written request."

Dr. Hearst was, at the time, a member of the school board.

After the commencement of this suit, written contracts were made with each of the student teachers. As throwing light upon the methods pursued, the following excerpt is taken from the testimony of Miss Murphy, one of the grade teachers:

"There are regular room teachers in four rooms. There is Miss Turner's room, Miss Bawder's room, Miss Raymond's room, and mine. In Miss Turner's room, no one had charge there except herself and whatever student teacher she may have. Miss Rait is a critic and supervisor over the student teachers in the Miner Building, and teach-

es occasionally, I think. She has not taught in my room, but has taught in the second grade of my room. The room I am responsible for is both the first and second grades. The teaching in the second grade is done by the student teachers, under Miss Rait's supervision. To some extent, I have part in the supervision of them. They are in my room for opening exercises, and for music and penmanship. That is all I have time for; but I keep their grades, and try to keep in touch with them, as much as I can. I have seen some of the outlines for the second grade work. They don't hand them to me, and I don't ask for them. What I did toward keeping in touch with the progress and being responsible for the work and advancement of the pupils in this second grade was that I occasionally see the outlines that have been handed to me. The first and second grade teachers meet every month, and in that way we keep in touch with each other, and know what work is being done. I get information at these teachers' meetings of the progress my room is making. We try to cover the same amount of ground in each grade for the month. There is no open doorway between the room where I teach the first grade pupils and where the second grade is being taught. The entrance to each room is from the hallway. I have been in that room when teaching was going on, for the purpose of observing; but I could only stay a few minutes at a time, because there was no one to teach my first grade while I was gone. I could only stay a few moments, but in that time could determine something of the character of the work being done by the teacher, by listening a few moments to recitations. In the first room, we are busy all the time with recitations. I get $4.50 a month from the college for ten months, which is the same as $5.00 per month for the regular nine-month school period. My duties cover only nine months. At these different times when I have stepped into the second grade room to observe, critic

or supervisor teachers were almost always present. The critic teacher, at times, was doing the teaching there, and in such instances the student teacher was merely observing. During the present year, there were two student teachers in the morning and two in the afternoon. They stayed for the full half day, and conducted different groups of pupils. One group was taken to the basement, and, I think, the other upstairs. The same arrangement was for the afternoon, except they used the kindergarten room, which was vacant in the afternoon. Each group of pupils was under the same student teachers during the entire twelve weeks."

And, in this connection, attention is also called to the following material provisions of the Supplement to the Code, 1913:

"Sec. 2734-c. On the last Friday, and Wednesday and Thursday preceding, in the months of January, June, July and October, the county superintendent shall meet and, with such assistants as may be necessary, examine all applicants for a teachers' certificate. Such examinations shall be held at the county seat, in a suitable room which shall be provided for that purpose by the board of supervisors; but the county superintendent may at his discretion cause to be held at the time of any regular examination an additional examination at some other place in the county. The questions used in such examinations shall be furnished by the educational board of examiners, who shall cause the same to be printed, and the examinations shall be conducted strictly under rules prescribed by the board.

"Sec. 2734-d. The examination for the first grade certificate shall include competency in and ability to teach orthography, reading, writing, arithmetic, geography, grammar, history of the United States, didactics, elementary civics, elementary algebra, political economy, elementary economics, elementary physics, elements of vocal music, physiology and hygiene, which in each division of the sub-

ject shall include special reference to the effects of alcohol, stimulants and narcotics upon the human system.

"Sec. 2734-g. Applicants who have taught successfully for at least thirty-six weeks and whose examination entitles them to the first grade certificate, shall receive the same for a term of three years from the date thereof, and such certificates shall be renewable without examination provided the applicants shall show by testimonials from superintendents or principals who had immediate supervision of their professional study that at least one line of professional inquiry has been successfully conducted during the life of the certificate, it being made the duty of the board to forward with each certificate subject to renewal, outlines setting forth various lines of professional study. It is provided further that each application for renewal shall be accompanied by such proof of successful experience and professional spirit as the educational board of examiners may require.

"Sec. 2734-h. Applicants whose examination entitled them to second grade certificates only, shall receive the same for not to exceed two years with the privilege of renewal of the same without further examination under the same conditions as govern the renewal of first grade certificates. The holder of a second grade certificate may at any of the examinations provided for in Section 2734-c of the Supplement to the Code, 1907, take an examination in any one or more of the additional branches, required for the issue of a first grade certificate, or he may at any such time be re-examined in any branch or branches in which he desires to raise his grade, and in each case the new per cent shall be placed on his certificate, and when he has thus successfully passed in all the branches required for the issue of a first grade certificate, such certificate shall then be issued to him, provided he has had at least thirty-six weeks' successful experience in teaching; if not, then at

the conclusion of such experience. In like manner third grade certificates may be changed into those of the second or first grade, and in all cases whether the certificate be of the first, second or third grade, credit shall be given for all examinations taken under the auspices of the board, it being the intention of the law that an examination once taken shall be final unless the certificate holder desires to be re-examined in any one or more branches with a view of raising his per cent in such branches or his general average.

"Sec. 2734-i. Applicants whose examination entitles them to third grade certificates only, shall receive the same for one year, at the end of which time upon proof of successful teaching and the payment of a fee of one dollar, one renewal shall be granted.

"Sec. 2734-j. Applicants who have had no experience in teaching, but whose examination entitles them to the first grade, shall receive a second grade certificate for two years, provided that when they have taught successfully under such certificate for not less than thirty-six weeks, they shall be entitled to receive a first grade certificate on the conditions herein provided for a renewal of a certificate.

"Sec. 2734-p. Each applicant for a certificate shall pay a fee of one dollar, one half of which shall be paid into the state treasury on or before the first day of the succeeding month, and one half shall be paid into the county institute fund. Provided, however, that applicants for teachers' certificates after July 1, 1915, shall have had at least 12 weeks of normal training, and shall at the time of making such application furnish a certificate in writing from the institution where such training was received, showing such fact. It is further provided, that this act shall not apply to the regular graduates of the state university, state college of agriculture and mechanic arts, state teachers' college, any accredited college of the state, or of any other college of like character outside of the state.
*   *   *

"Sec. 2734-p2. If there should be schools without teachers and teachers cannot be secured with qualifications as provided in Sections 1 or 2 of this act, then provisional certificates may be issued regardless of qualifications as provided in said sections to so many teachers as shall be required to supply such schools.

"Sec. 2734-s. When a sufficient number of licensed teachers cannot be secured to fill the schools of any county, the board of examiners may, upon the request of the county superintendent, appoint a special examination for such county to be conducted in all respects as a regular examination and the answer papers to be forwarded to the president of the board as required in regular examinations, and thereupon provisional certificates may be issued by the educational board of examiners.     *     *     *

"Sec. 2778-a. That all teachers in the public schools of this state shall be paid for their services a minimum wage of not less than the amounts hereinafter set forth, all fractions in average grades to be figured at the nearest whole number:

"1. Teachers holding a first grade uniform county certificate or higher, shall be paid a daily wage of not less than a sum obtained by multiplying three cents by the general average grade shown on such certificate.

"2. Teachers holding a second grade uniform county certificate shall be paid a daily wage of not less than a sum obtained by multiplying two and three-quarters cents by the general average grade shown on such certificate up to and including a general average grade of eighty-five per cent.

"3. Teachers holding a third grade uniform county certificate shall be paid a daily wage of not less than a sum obtained by multiplying two and one-half cents by the general average [grade] shown on such certificate.

"Provided that a teacher having contracted on a sec-

ond or third grade certificate in conformity with this act, shall fulfill such contract at the wage fixed at the time of signing same, plus any additional credit earned under Section 2 hereof.

"Sec. 2778-c. It shall be unlawful for any school board or any school officer to contract for or pay a less wage to any teacher in the public schools of this state than the minimum amounts herein fixed for the grade certificate held by such public school teacher. But nothing herein shall be construed as limiting the right to make a lawful contract for a higher wage than herein specified as a minimum.

"Sec. 2778-d. Any school officer violating the provisions of this act shall be fined a sum of not less than $25, nor more than $100, in the discretion of the court, and shall be suspended from office."

The manifest purpose of the enactment of the foregoing statutes was to prescribe the qualifications of teachers, and make it imperative upon the school board to employ no one not thus qualified. It may be conceded that a court of equity cannot control the discretion of a school board in the selection of applicants holding certificates issued by the superintendent, after due examination, and who have been found efficient, as to what particular applicant shall be employed. The selection of teachers from a number of properly certified applicants is clearly a matter wholly within the discretion of the school board. None of the student teachers referred to held such a certificate from the state superintendent. They held only provisional certificates, issued upon the application of the county superintendent, in furtherance of the so-called co-operative plan, by which a course in pedagogy prescribed by the State Teachers' College might, in part, be pursued by students of that institution in the public schools of Cedar Falls.

Section 2734-p2 of the 1913 Supplement, authorizing

the issuance of provisional certificates, is too plain to be misunderstood. Analyzed, it authorizes the issuance of provisional certificates (a) when there are schools without teachers, and teachers possessing the qualifications required by statute cannot be secured, and (b) to so many teachers as shall be required to supply such schools only as are unable to procure teachers having the necessary qualifications. It is not claimed by counsel for appellant, nor is there anything in the record tending in any way to show, that any of the students were employed to fill vacancies in the public schools of Cedar Falls not already filled, or that could not be filled, by teachers possessing the necessary qualifications. Indeed, the record is undisputed that the sole purpose for which the pupils of the Teachers' College were employed by the defendant school board was to enable them to have the practice teaching required by the college, and that the issuance of provisional certificates to these students was a subterfuge, and for the purpose of evading the provisions of the statutes above quoted. This is made apparent by the testimony of the county superintendent, quoted above. There was, in fact, no vacancy in the schools of Cedar Falls. A shortage of legally qualified teachers did not exist, and no such claim is made by appellants. Applicants holding provisional certificates, under the above statute, could be legally employed only to teach schools for which no teacher having the qualifications prescribed by statute could be secured. Such are the plain provisions of Section 2734-s, supra. As to this matter, a school board has no discretion. Of two applicants to fill a vacancy, the board must employ the one holding a certificate showing her to possess the statutory qualifications. In other words, the holder of a provisional certificate, legally issued, may be employed only to teach a school for which a properly qualified teacher could not be had, and no right is conferred thereby to teach in schools for which properly certified

teachers are available. Further, the compensation paid the student teachers is, of course, inadequate, and does not comply with the statute. The contract employing them for a nominal consideration violates the spirit, if not the letter, of Sections 2778-a, 2778-c, and 2778-d, supra. It is perhaps true that a provisional certificate is not classified as a first, second, or third grade; but certainly, no school board may, under the statutes and public policy of this state, employ a corps of teachers at a salary below that allowed by statute to holders of third grade certificates.

If holders of provisional certificates may legally be employed, under the circumstances shown in the record, at a nominal wage, and no power exists in a court of equity to interfere therewith because of the extraordinary discretion vested in school boards, then the statutes quoted and the efforts of the legislature to provide only thoroughly qualified teachers for our common schools are rendered of no avail. The legislature having prescribed qualifications for teachers in the public schools, patrons, taxed for the support thereof, should not be denied the right to have such teachers employed therein, when they can be secured; nor, having been employed, should they give place to some student, pursuing a course in pedagogy in some other institution. Teachers not so qualified should be employed only when the supply is inadequate, and the need cannot be otherwise met. The letter and spirit of the statute should be observed. Provisional certificates can be legally issued and the holders thereof employed only in case of an emergency, recognized by statute. Pupils attending the public schools of this state have the right to receive instructions from legally qualified teachers, and the school boards are bound by the statutes, and can exercise no discretion in violation of the plain provisions thereof. Manifestly, as the Teachers' College desires that the co-operative plan adopted be continued, under the holding of the majority vacancies may per-

manently exist in the schools of Cedar Falls, notwithstand-
ing the fact that the usual number of legally qualified teach-
ers are employed therein, and many possessing like qualifi-
cations are seeking employment in such schools.   The acts
of the board complained of, in the opinion of the writer,
clearly and palpably violate the statutes quoted, and, upon
the authority of numerous prior holdings of this court, were
properly enjoined.   *Templer v. School Township,* 160 Iowa
398, 401;   *Aananson v. Anderson,* 70 Iowa 102;   *Kinzer v.
Independent School Dist.,* 129 Iowa 441, 443;   *Perkins v.
Independent School Dist.,* 56 Iowa 476;   *Burkhead v. In-
dependent School Dist.,* 107 Iowa 29;   *State v. Thomas,*
152 Iowa 500, 503;   *Hinkle v. Saddler,* 97 Iowa 526;   *Rodg-
ers v. Independent School Dist.,* 100 Iowa 317;   *Hume v.
Independent School Dist.,* 180 Iowa 1233;   *Knowlton v.
Baumhover,* 182 Iowa 691.   The conclusion above an-
nounced finds support in *Lindblad v. Board of Ed.,* 221 Ill.
261 (77 N. E. 450), cited in the majority opinion.

II.   It is suggested by the majority that plaintiffs'
remedy was by appeal to the county superintendent, and,
if unsuccessful upon such appeal, then to the superinten-
dent of public instruction.   Of course, this holding rests
upon the assumption that the act of employing the student
teachers falls within the discretionary powers of the board.
As appears from the extracts quoted above from the tes-
timony of the county superintendent, the application to
the state superintendent for provisional certificates for the
student teachers was made upon a full understanding of
the purpose for which same was desired, and after consul-
tation with the president of the Teachers' College, and in
collaboration therewith and with the school board.   By
saying this, I do not mean in any way to impugn the good
faith of the superintendent or the other parties.

An appeal, under such circumstances, even admitting
the high character of both officers, might not commend it-

self to practical-minded school patrons. A remedy may be theoretically adequate, but practically unsatisfactory. I would affirm.

LADD, C. J., and GAYNOR, J., join in this dissent.